UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MAKSIM NIKULSHIN, | Case No.: 6:16-mj-00014-MJS-1<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**<br><br>(ECF No. 20)<br><br>Status Conf: April 4, 2018, 10:00 AM |

This matter comes before the Court on Defendant's motion to suppress evidence seized in the course of an encounter and arrest of Defendant Maksim Nikulshin in Yosemite National Park on January 18, 2016. For the reasons stated below, the motion will be denied.

**I.   Procedural Background**

A criminal complaint was filed against Mr. Nikulshin on February 26, 2016, charging him with four counts: (1) Being present in the park while under the influence of alcohol to a degree that may endanger oneself or another person in violation of 36 C.F.R. § 2.35(c); (2) Failing to report a motor vehicle accident resulting in property damage in violation of 36 C.F.R. § 4.4(a); (3) Operating a motor vehicle while under the

1

1  influence of alcohol in violation of 36 C.F.R. § 4.23(a)(1); and (4) Operating a motor
2  vehicle with an alcohol concentration greater than or equal to .08 grams per 210 liters of
3  breath in violation of 36 C.F.R. § 4.23(a)(2).
4  Counsel for Mr. Nikulshin filed a Motion to Suppress on June 12, 2017 (ECF No.
5  20), arguing that Ranger Jack Hoeflich's actions and statements amounted to a seizure
6  of Mr. Nikulshin while Mr. Nikulshin was still in his tent, and that his exiting of the tent
7  occurred as part of that seizure. (Id. at 10.) The motion requested suppression of
8  evidence gained as a result of this purportedly illegal seizure. (Id. at 21.) The
9  Government filed a response in opposition to the motion on July 10, 2017. (ECF No. 21.)
10 The Government argued that the encounter between Ranger Hoeflich was a consensual
11 "knock and talk," and that evidence resulting from Mr. Nikulshin's purportedly consensual
12 exiting of the tent should not be suppressed. (Id. at 5.)

The Court held an evidentiary hearing on November 30, 2017. (ECF No. 38.) Ranger Hoeflich testified for the government and was the sole witness. Portions of Ranger Hoeflich's body camera footage were played in court. Defendant was not available for examination. At the close of the hearing, the Court directed the parties to submit a joint statement of facts. They did so. (ECF No. 40.) The issues raised in the motion are submitted and ready for adjudication.

**II.  Facts**

The statement of facts which follows was jointly prepared and agreed to by the parties and is accepted, and reproduced here, as prepared by them.

At approximately 1:12 p.m. on January 18, 2016, in Yosemite National Park, law enforcement dispatch relayed a report from a concession employee that a white pickup truck had hit a parked car in the Curry Village parking lot and left the scene. At approximately 1:30 p.m., Ranger Jack Hoeflich responded to the call and contacted the reporting party. The reporting party indicated that prior to calling dispatch, he had observed a white pickup truck parked at an angle in the Curry Village parking lot, watched the driver exit the vehicle and enter the Mountain Shop, witnessed the man "not

2

walking straight" as he approached his car, attempted to stop the individual from entering the car, and ultimately saw the white pickup truck "graze" the vehicle next to it as it backed out from the parking lot and drove away. The reporting party then gave a description of the driver and noted that the white pickup bore a New Jersey license plate.

At approximately 1:45 p.m., Ranger Hoeflich located a white pickup truck with a New Jersey license plate parked and unoccupied at Upper Pines Campground, site 161. Ranger Hoeflich ran the vehicle's license plate number, approached the vehicle, felt the hood of the car, peered inside the vehicle, entered the campsite, and began approaching a blue dome tent with several pairs of shoes outside the door. While walking toward the tent, dispatch reported to Ranger Hoeflich that the vehicle's registration was valid and the vehicle was registered to a "Zachary Laut" of New Jersey. Ranger Hoeflich proceeded to walk towards the tent and came within feet of the tent's entrance. While standing above the tent, the following exchange was captured on Ranger Hoeflich's body camera:[1]

| Speaker | Statement | Approx. Time |
|---|---|---|
| Hoeflich | "Hey, Mr. Laut" | 0:57 |
| Hoeflich | "Mr. Laut" | 0:59 |
| Hoeflich | "Hello, Park Ranger" | 1:01 |
| Hoeflich | "Park Ranger, you got your shoes out here, sounds like you're probably in there" | 1:03 |
| Hoeflich | "Mr. Laut, please come out" | 1:08 |
| Hoeflich | "Mr. Laut" | 1:11 |
| Hoeflich | "You okay?" [Ranger Hoeflich grasps a pole of the tent and shakes it.] | 1:13 |
| Hoeflich | "Mr. Laut" | 1:15 |
| Hoeflich | "Come on out please" | 1:17 |
| Mr. Nikulshin | "Yes[?]" | 1:20 |
| Hoeflich | "Please come out Mr. Laut. Park Ranger. | 1:20 |
| Mr. Nikulshin | "Yes [inaudible]." | 1:24 |
| Hoeflich | "Can I talk to you?" | 1:24 |
| Mr. Nikulshin | "Yes, sure." | 1:25 |
| Hoeflich | "Do you have any weapons in the tent?" | 1:41 |
| Mr. Nikulshin | "No." | 1:42 |

---

[1] The entry for "Approximate Time" refers to the time stamp on Ranger Hoeflich's body camera recording, which appears at Exhibit B to the Motion to Suppress.

3

| Hoeflich | "Okay" | 1:43 |
| --- | --- | --- |
| Hoeflich | "How are you doing today?" | 1:49 |
| Mr. Nikulshin | "Alright" | 1:50 |
| Hoeflich | "Okay. Just out for a drive?" | 1:51 |
| Mr. Nikulshin | "I'm sorry?" | 1:56 |
| Hoeflich | "Were you just out for a drive a little bit ago?" | 1:56 |
| Mr. Nikulshin | "Um no, I was sleeping." | 2:00 |
| Hoeflich | "Well, your car's warm, the engine's warm. And I had someone that saw you hit another vehicle, so I need you to come out and talk to me." | 2:01 |
| Mr. Nikulshin | "Yeah, sure." | 2:13 |
| Hoeflich | "Did you drive over to Curry Village?" | 2:14 |
| Mr. Nikulshin | "Uh, yeah." | 2:17 |
| Hoeflich | "You did, how long ago?" | 2:18 |
| Mr. Nikulshin | "Umm." | 2:20 |

At approximately the two minute and twenty-two second mark of the video, Defendant Maksim Nikulshin fully exited the tent. Ranger Hoeflich then continued the investigation. Ranger Hoeflich stated that the defendant should put his shoes on. At approximately the three minute and forty second mark of the video, Ranger Hoeflich radioed to another ranger, stating "Could you go by the Mountain Shop and get [the reporting party] and we could do a drive by to identify?" Another park ranger, Ranger Hahn, approached Mr. Nikushin and Ranger Hoeflich around this time and assisted with the investigation. At approximately the three minute and fifty second mark of the video, Ranger Hoeflich stated, "Why don't you come out here and sit at the picnic table." Mr. Nikulshin sat at a picnic table near the tent while the ranger continued the investigation. Another ranger brought the reporting party to the scene while Rangers Hahn and Hoeflich continued to ask Mr. Nikulshin questions. From a distance, the reporting party identified Mr. Nikulshin as the driver. The rangers placed Mr. Nikulshin under arrest and Ranger Hahn transported him to the Yosemite Holding Facility.

**III.    Ranger Hoeflich's Testimony at the November 30, 2017 Evidentiary Hearing**

The Court held an evidentiary hearing on November 30, 2017. (ECF No. 38.) Ranger Hoeflich testified for the government and was the sole witness. Portions of

Ranger Hoeflich's body camera footage were played in court. The Government's direct examination of Ranger Hoeflich began at 9:34 a.m. and lasted until 10:19 a.m. Defense counsel's cross-examination of Ranger Hoeflich began at 11:04 a.m. and lasted until 11:40 a.m. The Government's re-direct of Ranger Hoeflich began at 11:41 a.m. and concluded at 11:44 a.m. The following represents a summary of the main statements elicited from Ranger Hoeflich on direct, cross, and re-direct examination, but is not intended to be an exhaustive recounting of Ranger Hoeflich's entire testimony.

Ranger Hoeflich indicated that his intent when speaking with Mr. Niklulshin was to perform a consensual "knock and talk" encounter as part of his investigation of the potential DUI in Curry Village. Ranger Hoeflich testified that his investigative purpose was twofold: (1) to determine whether there was anyone in the tent fitting the description provided by the reporting party; and (2) if there was such a person, to determine whether that person was intoxicated or impaired, as opposed to simply a bad driver or someone with a medical condition that simulated impaired driving.

Ranger Hoeflich testified that during the encounter with Mr. Nikulshin, at approximately the 1:24 second of the video, he heard the sound of a zipper moving on Mr. Nikulshin's tent. From this point forward, Ranger Hoeflich believed that Mr. Nikulshin was in the process of exiting the tent. He further testified that Mr. Nikulshin at no time took action or made statements inconsistent with exiting the tent, nor did Mr. Nikulshin take action or make statements indicating that he wished to terminate the encounter. Ranger Hoeflich testified that he viewed shaking a tent's pole as akin to knocking on the door of a residence.

On cross-examination, Ranger Hoeflich acknowledged that a report he authored described the encounter with Mr. Nikulshin using the following description:

> I called out for Mr. Lauth (sic), the registered owner of the pickup several times and then rattle (sic) the tent continuing to call for Mr. Lauth and asking him to come out. After about 25 seconds I heard a voice from the inside. A white male with short blond hair opened the tent door and agreed to speak with me. The man denied having weapons in the tent. The man agreed to come out of the tent.

1  Ranger Hoeflich testified that the report was authored shortly after the encounter and
2  that his memory was fresher at the time he wrote the report.

3  Ranger Hoeflich also testified that he stated that he was a "Park Ranger" several
4  times while outside Mr. Nikulshin's tent. Ranger Hoeflich testified that he "rattled" or
5  "shook" Mr. Nikulshin's tent prior to Mr. Nikulshin exiting the tent.

6  Ranger Hoeflich testified that he requested that Mr. Nikulshin come out of the tent
7  multiple times. Ranger Hoeflich characterized his statements to Mr. Nikulshin as
8  requests to come out of the tent. Ranger Hoeflich testified that he authored a later report
9  after speaking with members of the Yosemite Legal Office and the United States
10 Attorney's Office. He testified that his later report did not mention the issue of requesting
11 Mr. Nikulshin to come out of the tent and he could not explain why that fact was not
12 mentioned.

13 Ranger Hoeflich testified that he stood outside what appeared to be the tent's
14 primary entrance and exit during the encounter. Ranger Hoeflich testified that he did not
15 seek to obtain a search warrant for the tent and that he did not believe there was
16 probable cause to seek one.

**IV.     Applicable Law**

The Fourth Amendment to the United States Constitution protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." Silverman v. United States, 365 U.S. 505, 511 (1961). United States v. Payton held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." 445 U.S. 573, 576 (1980). Without a warrant, such a seizure is "presumptively unreasonable," even in circumstances where probable cause exists to believe that incriminating evidence will be found within the home. Id. at 586, 588-89. No "zone of privacy" is more clearly defined than "the unambiguous physical

dimensions of an individual's home[.]" Id. at 589. The "line at the entrance to the house" constitutes the "threshold [that] may not reasonably be crossed without a warrant." Id. at 590.

The Ninth Circuit has extended such protection to the occupant of a tent, holding that he or she has a reasonable Fourth Amendment expectation of privacy while in a tent pitched on private or public land. See LaDuke v. Nelson, 762 F.2d 1318, 1326 n.11, 1332 n. 19 (9th Cir. 1985) (expectation of privacy in a tent on private land); United States v. Gooch, 6 F.3d 673, 677 (9th Cir. 1993) (expectation of privacy in a tent on public land).

> By establishing a campground, the state created a situation where campers were invited to come to set up a tent. The campers could reasonably assert a legitimate, though temporary, interest in their privacy even in this short-term 'dwelling.' A guest in Yellowstone Lodge, a hotel on government park land, would have no less reasonable an expectation of privacy in his hotel room than a guest in a private hotel, and that same logic would extend to a campsite where the opportunity is extended to spend the night.

Gooch, 6 F.3d at 678. Accordingly, for Fourth Amendments purposes tents in a public campground are protected as are permanent structures. Id. at 677.

Whether a brick structure or a tent, the Supreme Court has "refused to lock the Fourth Amendment into instances of actual trespass." United States v. U.S. Dist. Court, 407 U.S. 297, 313 (1972); Kyllo v. United States, 533 U.S. 27, 32 (2001) (noting that the Supreme Court has expressly "decoupled violation of a person's Fourth Amendment rights from trespassory violation of his property") (citing Rakas v. Illinois, 439 U.S. 128, 143 (1978)).

The Payton line -- the "threshold [that] may not reasonably be crossed without a warrant" -- "can be breached by conduct other than physical entry." United States v. Reeves, 524 F.3d 1161, 1165 (10th Cir. 2008). An officer need not physically enter the home for the Payton protections to apply. Id. Rather, "it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home." United States v. Johnson, 626 F.2d 753, 757 (9th Cir. 1980).

However, law enforcement does not offend the Fourth Amendment by approaching residences, identifying themselves, and asking occupants to come out to speak with them. See Kentucky v. King, 563 U.S. 452, 469 (2011) ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do"); United States v. Vaneaton, 49 F.3d 1423, 1427 (9th Cir. 1995) ("Knocking on a door to attempt to contact a person inside is a common event and hardly a hallmark of a police state"). Seizure occurs "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" or terminate the encounter. United States v. Redlightning, 624 F.3d 1090, 1102 (9th Cir. 2010) (quoting United States v. Mendenhall, 446 F.3d 544, 554 (1980)).

An encounter at a doorstep may constitute a "constructive entry" in violation of the Fourth Amendment when the police, though not entering the house, engage in tactics that essentially force the individual out of the home by making the individual reasonably believe that he had no choice but to comply. See United States v. Al-Azzawy, 784 F.2d 890, 893 n.1 (9th Cir. 1985) (recognizing the Ninth Circuit's acceptance of the "constructive entry" doctrine in a case where officers with drawn weapons surrounded a trailer and used a bullhorn to order a suspect out and onto his knees). See also United States v. Nora, 765 F.3d 1049, 1054 (9th Cir. 2014); Fisher v. City of San Jose, 558 F.3d 1069, 1082 (9th Cir. 2009); United States v. Saari, 272 F.3d 804 (6th Cir. 2001); Reeves, 524 F.3d 1161 (officers' conduct would lead a reasonable person to believe he was not free to ignore their repeated phone calls, knock on the door and window of a motel room, shining flashlights through the window, and loudly identifying themselves as law enforcement for over 20 minutes.); United States v. Jerez, 108 F.3d 684, 687 (7th Cir. 1997) (sheriff's deputies knocked on suspect's motel door for several minutes in the middle of the night and shone a light on his head, until he, though clearly wanting to avoid the encounter, ultimately was forced to address the officers). The Ninth Circuit described the "unusual[] persistence of the officers in Jerez as "unique," in later

8

distinguishing the case. United States v. Cormier, 220 F.3d 1103, 1110 (9th Cir. 2000).

An individual is arrested or seized for Fourth Amendment purposes "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). "[A] person has been 'seized' . . . only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Mendenhall, 446 U.S. at 554. Circumstances that indicate a seizure include, but are not limited to, "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id. A seizure is more likely to be found when officers brandish weapons, make intimidating movements, provide overwhelming shows of force, block exits, issue threats, use commands, or employ authoritative tones of voice. United States v. Drayton, 536 U.S. 194, 204 (2002). Absent such compulsion, an individual's decision to exit a residence does not transform the encounter into a seizure. See United States v. Basher, 629 F.3d 1161, 1166 (9th Cir. 2011); Cormier, 220 F.3d at 1110 (9th Cir. 2000). "The appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 436 (1991); see Michigan v. Chesternut, 486 U.S. 567, 576 (1988) (a seizure occurs if "[the defendant] could reasonably have believed that he was not free to disregard the police presence and go about his business").

**V.     Discussion**

    **A.     Arguments**

The Government argues that Basher, 629 F.3d 1161, involves a "nearly identical" arrest following a "knock and talk" at a tent. The Ninth Circuit found that encounter to be consensual where the Bashers left their tent "voluntarily". Id. There, two officers drove up to the campsite of an individual reported to have been shooting firearms illegally and blocked Mr. Basher's truck from exiting. Id. at 1163. They approached the tent,

announced that they were from the sheriff's office and asked Mr. Basher and his son to exit the tent. Id. at 1164. At this point, Mr. Basher and his son voluntarily did so and answered the officer's questions after having been told to keep their hands in view. Id. Mr. Basher acknowledged possession of a weapon in the tent. The officers asked the son to reenter the tent and retrieve the weapon. Id. The Ninth Circuit found that the defendant's valid consent rendered both the search and ensuing arrest legal. Id. at 1168. The defense distinguishes Basher on the grounds that the officers did not order the Bashers out of their tent, whereas, the defense claims, Ranger Hoeflich ordered Mr. Nikulshin to come out multiple times.

The Government also relies on United States v. Crapser, 472 F.3d 1141 (9th Cir. 2007) for the proposition that once a suspect voluntarily gives up the protection the home provides against unwarranted intrusions, he can be subjected to a valid Terry stop and ensuing seizure. In Crapser, law enforcement officers knocked on a motel room door and asked the occupants to come out. The defendant's female companion nodded yes to their request and, after several minutes, she and the defendant came out onto the sidewalk, and the defendant subsequently was seized. Id. The Ninth circuit held:

> [T]hat when a suspect voluntarily opens the door of his residence in response to a non-coercive "knock and talk" request, the police may temporarily seize the suspect outside the home (or at the threshold) provided that they have reasonable suspicion of criminal activity. If an arrest in the doorway is allowed, certainly the lesser intrusion of a *Terry* stop in the hallway is also permissible.

Id.

Again, the defense here argues that there is no indication Crapser was ordered to exit the motel room as Mr. Nikulshin claims to have been. The police there did not demand the door be opened, give orders, or affirmatively assert authority over Crapser.

Lastly, the government cites to Cormier, 220 F.3d 1103, for the proposition that an unlawful seizure claim is invalidated by consent. In doing so it cited to a Third Circuit case, United States v Kim, 27 F.3d 947, 951 (3d Cir. 1994). The encounter at issue in Kim:

10

> [B]egan with a polite knock at the door of Kim's roomette. Small [the law enforcement officer] was in plain clothes, his gun was not visible, nor did he ever display his gun. When Kim responded by opening the door, Small commenced the conversation by asking politely how Kim and Youn were doing and identifying himself as employed by a police department. Small then requested, 'Can I talk to you for a second?' Without hesitation or equivocation, Kim answered, 'Yeah.' The conversation went forward in a normal conversational tone. Without more, the posture of the encounter indicated that it was purely consensual.

Id. at 951.

However, the defense argues that the officer in Cormier never said she was a police officer or compelled Cormier to open the door "under the badge of authority."

**B.    Analysis**

Ranger Hoeflich did not have a warrant when he visited Mr. Nikulshin's tent on January 18, 2016. He did not then have probable cause to arrest Nikulshin. He did not enter Mr. Nikulshin's tent and arrest him. Instead, he took actions and said things which led to Mr. Nikulshin exiting the tent. Thereafter, circumstances developed which led to Mr. Nikulshin's arrest.

Defendant challenges the constitutional authority of Ranger Hoeflich to have spoken and acted the way he did to produce Mr. Nikulshin from the tent. The issue the defense presents is, quite simply, whether the words spoken and actions taken by Ranger Hoeflich which led to Mr. Nikulshin exiting the tent constituted a seizure of Mr. Nikulshin in violation of the Fourth Amendment of the Constitution.

The rules of law applicable to this singular issue are discussed above, are quite clear and are summarized in lay terms as follows:

The Fourth Amendment protects people from being seized without a warrant (or other circumstances not present here) from their tents just as it protects them from such seizure in constructed buildings. A person can be "seized" within the meaning of the Fourth Amendment even without law enforcement entering the tent or house and physically taking control of the person. Police actions taken, words spoken, and the

11

manner in which words are spoken can be such as to effectively compel a suspect to involuntarily step into law enforcement arms and be unconstitutionally seized. However, an officer merely walking up to a tent or a house and asking the occupant, even a targeted suspect, to come out and talk to the officer does not constitute a seizure. A suspect voluntarily responding to such a request by stepping outside and conversing with the officer is not a victim of an unlawful police seizure.

What makes a non-intrusive, non-physical law enforcement contact with a suspect in circumstances such as these unconstitutional? Guiding principles and examples of "seizures" exist: When the police engage in tactics that essentially force the suspect out of the home by making him believe he has no choice but to comply with a request that he come out, Al-Azzawy, 784 F.2d at 893 n.1; When the officer by some means of physical force or show of authority restrains the liberty of the suspect, Terry, 392 U.S. 19 n.16); And when, in view of all the circumstances surrounding the incident, a reasonable person would not believe he was free to leave, Mendenhall, 446 U.S. at 554, or free to terminate the encounter, Bostick, 501 U.S. at 436.

Thus, officers with drawn weapons surrounding a trailer house and using a bullhorn to order a suspect out and unto his knees is a seizure. Al-Azzawy, 784 F.2d at 893 n.1. So, too, is 20 minutes of repeated police phone calls, knocking on a window and door, shining flashlights in, and loudly identifying themselves as law enforcement. ); Reeves, 524 F.3d 1161. As is unusual persistence in knocking on the door of a suspect's motel room in the middle of the night and shining a light on the head of a suspect who clearly does not want to come out voluntarily. Cormier, 220 F.3d at 1110 (citing Jerez, 108 F.3d at 687).

Factors to be considered in evaluating the voluntariness of the suspect's submission to police in such circumstances include: the presence of multiple officers or other show of overwhelming force; police brandishing of a weapon or making other intimidating movements; an officer physically touching the person; police use of language or authoritative tone of voice to indicate a command is being made or that

12

1 compliance with the request might be compelled; threats. Drayton, 536 U.S. at 204.

2 In his dealings with Mr. Nikulshin, Ranger Hoeflich made no "show" of force. He did not have his weapon drawn or even indicate that he had a weapon or any other means of controlling Mr. Nikulshin by force. He was alone. He did not intrude into the tent's interior with a light or anything other than his voice. He did not directly touch Mr. Nikulshin. The undersigned finds nothing in the tone or volume of Ranger Hoeflich's voice, as reflected in the audio recording, to suggest a "command" or a threat of negative consequences if not complied with; the voice seems no more loud than necessary to be heard though the tent wall. The Ranger did not use a bullhorn. The exchange that preceded Defendant's agreement to talk with Hoeflich lasted one minute and nineteen seconds; the entire pre-emergence exchange lasted two minutes and twenty seconds. .

Though Ranger Hoeflich does not appear to be blocking Mr. Nikulshin's exit from the tent, there likely was no other exit than the one next to where Hoeflich was standing. Note, however, that stationing officers at a building's exits to ensure no occupant left undetected without being questioned is not cause for a reasonable person to believe he had to answer questions or that he would be prohibited from leaving. Immigration & Naturalization Serv. V. Delgado, 466 U.S. 210, 219 (1984).

Ranger Hoeflich did put his hand on the tent and shake the tent pole in a manner that he characterized as the equivalent of a knock on the door of a structure. It appears on the video as simply an effort to get the attention of the occupant, to alert him through vibration that someone was outside trying to communicate with him. The Court finds it no more invasive than the knock on a door and knocking on the door was not an option given Nikulshin's fabric tent.

Ranger Hoeflich did identify himself as a Park Ranger, but not as "Police" or a "Police Officer." Notwithstanding Defendant's constantly repeated claims to the contrary throughout his brief, Ranger Hoeflich did not identify himself as "Law Enforcement" during the exchange at the tent. Defendant, in a self-serving declaration not subject to cross examination, says he thought Hoeflich was Law Enforcement because Hoeflich

13

"ordered" him to come out several times and was speaking "like a Law Enforcement Officer would". As discussed below, the Court concludes there was no such "Order" and nothing in Hoeflich's comments prior to Defendant's agreement to talk that a reasonable person might characterize as "law enforcement talk"; Nikulshin's claim to the contrary is not credible.[2]

Other than that, we have only the four requests/commands to Nikulshin to exit the tent and talk to Hoeflich before Defendat agreed to talk:

(1) "Mr. Laut, please come out."

(2) "Come out please."

(3) "Please come out Mr. Laut. Park Ranger."

(4) "Can I talk to you?"

Did these words and actions of Ranger Hoeflich constitute tactics that essentially forced Mr. Nikulshin out of his tent by making him believe he had no choice but to comply? Did they constitute such a show of authority as to restrain Mr. Nikulshin's liberty? Were they such as to cause a reasonable person to believe he was not free to terminate the encounter and or leave?

No.

While the average person might well have responded precisely as Mr. Nikulshin did to someone standing outside of his tent, trying to get his attention and asking him over a 90-second span to come out and talk to him, it cannot be said that he was ordered to do so in a way that left him no choice but to exit.

"Please come out", said twice, and "Can I talk to you?" said once, are requests, not commands, even when spoken by someone identified as a "Park Ranger." Whatever "Park Ranger" might have meant to Mr. Nikulshin, there is no credible evidence he did, or anyone reasonably could have, perceived the Ranger's requests to be "orders" by a

---

[2] In this regard, the Court takes notice of the fact that there are at least two categories of National Park Rangers prevalent and common in Yosemite National Park: "Interpretive" and "Law Enforcement". Both wear National Park Service uniforms, but the former do not display law enforcement accoutrements. The latter typically are equipped on duty with the equipment and weapons customarily worn by police and sheriff's officers.

14

law enforcement officer which, if ignored, would result in the use of force to compel compliance. Indeed, it is easy to imagine someone in Mr. Nikulshin's situation wholly ignoring the visit or simply responding: "I am sleeping. Go away and come back later."

Hoeflich's mention of the motor vehicle incident followed by his statement ". . . so I need you to come out and talk to me." does sound more like a Ranger investigating an accident in the way a law enforcement officer might, but remains far short of a command or order that, if ignored, will result in the use of force to ensure compliance. Persistence thereafter might have changed the Court's view of Ranger Hoeflich's action, but Mr. Nikulshin voluntary exit from the tent rendered such persistence unnecessary..

There is little to distinguish this case from Basher, 629 F.3d 1161. There was no Fourth Amendment violation in either case.

**VI.    Order**

For the reasons set forth above, Defendant Nikulshin's Motion to Suppress is hereby DENIED. A status conference will be held at the Yosemite Court at 10:00 AM, April 4, 2018, to determine the next steps in the prosecution of this case.

IT IS SO ORDERED.

Dated:   February 28, 2018                /s/ *Michael J. Seng*
                                                                                            UNITED STATES MAGISTRATE JUDGE